Filed 8/12/16  P. v. Dinh CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H042517 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1497950) |
| v. | |
| MAN QUOC DINH, | |
| Defendant and Appellant. | |

Defendant Man Quoc Dinh brought motions to suppress evidence (Pen. Code, § 1538.5, subd. (i))[1] and to set aside the information (§ 995). The trial court granted the motions and the People have appealed from these orders. We conclude that the trial court properly granted the motion to suppress evidence which was found during the officer's initial unlawful search. However, we also conclude that the trial court erred when it granted the motion to suppress evidence which was later found after defendant's wife gave her consent to search. Accordingly, the orders are reversed.

---

[1]     All further statutory references are to the Penal Code.

## I. Statement of the Case

A felony complaint alleged that defendant committed the offenses of possession of a firearm by a felon (§ 29800, subd. (a)(1)) and possession of ammunition by a felon (§ 30305, subd. (a)(1)).

At defendant's preliminary hearing, the magistrate heard defendant's suppression motion. The magistrate denied the motion and held defendant to answer on the complaint.

An information charged defendant with two counts of possession of a firearm by a felon, one count of possession of ammunition by a felon, and one count of possession of an assault weapon (§ 30605, subd. (a)).

Defendant renewed his suppression motion in the trial court and additional testimony from Officer Vinh Trinh was introduced. The trial court granted the motion to suppress. The trial court also granted defendant's section 995 motion to set aside the information and the case was dismissed.

## II. Statement of Facts

At approximately 1:20 a.m., on November 6, 2014, Officer Trinh and three other officers went to defendant's residence. Officer Trinh had been informed that a battery and vandalism had occurred "in another part of the city" at 1:00 a.m. or shortly thereafter and the suspects had left a van, which was registered in defendant's name, at the scene. According to Officer Trinh, defendant was not considered a suspect because he did not match the description of any of the suspects. Prior to making contact with defendant, the officer had conducted a records check and discovered that defendant had an outstanding arrest warrant for battery and brandishing a weapon. Officer Trinh did not know if the warrant authorized nighttime service and he did not request a criminal history check.

Defendant's residence was located in a four-unit apartment complex. There were two upstairs units and two downstairs units with an attached laundry room located on the

2

side of the building. The officers knocked on the door of apartment 3, which was on the ground floor. Jenny Tran, defendant's wife, answered the door. The officers explained that they were conducting an investigation involving defendant's van and asked to speak to him. Tran responded that defendant was in the laundry room around the corner. The laundry room was about 30 to 35 feet away from the door to defendant's apartment. The only access to the laundry room was through a door on which there was a locking handle and a dead bolt.

After the officers knocked on the door to the laundry room, two men opened the door and exited the room. One of the men identified himself as defendant. At that point, Officer Trinh was about three feet away from the open door. The room was approximately 10 feet by 20 feet. It appeared to Officer Trinh that "it just wasn't a functional laundry" and was used as a storage facility. In addition to the washer and dryer, there were chairs, a very large toy jeep propped up against the wall, food, seat cushions, a couple of rolled up rugs, blankets, beer bottles, a cooler, cooked noodles, cups, and a make-shift desk with a laptop computer on it. The beer, cups, cooked noodles, and a poker-related Web site displayed on the laptop computer indicated to Officer Trinh that the room was also a "hang out place." He thought that 10 to 15 people could have fit in the room.

Approximately two to three minutes after the two men exited the room, Officer Trinh "made a decision to conduct a protective sweep just to make sure there was no one else in the laundry room." The officer was not able to see behind the door, the washing machine, or the dryer. While three of the officers questioned the two men, Officer Trinh entered the laundry room. He walked around the door to make sure no one was standing behind the door and looked into other areas where people could be hiding. When he was in the middle of the room, he saw a pistol on a seat cushion across the room. The nine-millimeter pistol was loaded. The officer also saw multiple rounds of .380 caliber ammunition.

After defendant and his companion were handcuffed for officer safety, Officer Trinh and Sergeant Petrokavick returned to defendant's apartment and knocked on the door. Tran opened the door, but the steel cage door was still closed. Sergeant Petrokavick asked Tran for the location of the "380." When Tran appeared confused, Officer Trinh asked her where her husband kept his guns. Tran responded that he kept them under their bed. He asked her if it was all right if she could show him where defendant kept his guns. She replied, "Okay," opened the steel cage door, and allowed them in. The officers followed her to her bedroom where she pointed to the bed and said, "It's under the bed." Officer Trinh did not ask if he could search under the bed. The officer got down on his knees, looked under the bed, and removed an open gun case. When he pulled the gun case out from underneath the bed, he noticed that it was a TEC 9, which is considered an assault weapon. The serial number had been removed from the weapon. The weapon had an extended magazine clip with nine-millimeter rounds. There was also a bag containing miscellaneous caliber rounds. Sometime after confiscating the firearms, Officer Trinh learned that defendant was a felon.

Officer Trinh showed Tran the pistol that had been found in the laundry room. She told him that "her family and her husband's parents that live upstairs, only those two families would use the laundry room as a storage facility and no one else would really bother it." Tran also told the officers that defendant would often use the laundry room to play online poker on his computer, hang out with his friends, drink, and smoke, because she would not allow these activities in their apartment.

### III.    Discussion

The Fourth Amendment, made applicable to the states through the due process clause of the Fourteenth Amendment, protects the individual against unreasonable searches and seizures. (*Mapp v. Ohio* (1961) 367 U.S. 643, 655-660.) Evidence obtained

4

by a police officer in violation of the Fourth Amendment is subject to the exclusionary rule. (*Segura v. United States* (1984) 468 U.S. 796, 804.)

"A criminal defendant may test the unreasonableness of a search or seizure by making a motion to suppress at the preliminary hearing and, if unsuccessful, renewing the motion in superior court if held to answer." (*People v. Superior Court (Cooper)* (2003) 114 Cal.App.4th 713, 717.) Where new evidence is admitted before the superior court, we defer to the superior court's factual determinations where supported by substantial evidence. (*People v. Trujillo* (1990) 217 Cal.App.3d 1219, 1223-1224.) "In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

"The threshold question in any Fourth Amendment analysis is whether the person challenging the allegedly unlawful search had a constitutionally protected reasonable expectation of privacy with respect to the area or item searched. [Citation.] This involves a two-part inquiry: 'first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?' [Citations.] [¶] The reasonableness of a claimed expectation of privacy depends on the totality of circumstances presented in each case. [Citations.] The burden is on the defendant to prove that he or she had a protectible expectation of privacy in the area or item searched. [Citations.]" (*In re Baraka H.* (1992) 6 Cal.App.4th 1039, 1044.)

Relying on cases involving common areas in a building complex, the People contend that defendant did not have a reasonable expectation of privacy in the laundry room.

Here, the record establishes that the laundry room was within 35 feet of defendant's front door. Though defendant's wife referred to the room as a laundry room, it did not appear to Officer Trinh as "a functional laundry" room. Only defendant's

family and his parents used the room to store property, including chairs, a very large toy jeep, food, seat cushions, rolled up rugs, blankets, beer bottles, a cooler, cooked noodles, cups, and a make-shift desk with a laptop computer on it. Defendant often used this room to play online poker on his computer, hang out with his friends, drink, and smoke. This evidence established that defendant had manifested a subjective expectation of privacy in the room. The presence of beer, cups, cooked noodles, and a poker-related Web site on the laptop computer indicated to Officer Trinh that the room was also a "hang out place." Moreover, the door to the room had a locking handle as well as a deadbolt, and consequently was not open to the public. Thus, defendant's expectation of privacy in the room was reasonable.

The cases upon which the People rely are factually distinguishable. *People v. Galan* (1985) 163 Cal.App.3d 786 (*Galan*) held that there was no reasonable expectation of privacy in the garage of a condominium complex in which: (1) individuals commonly entered apartments through the garage; (2) the garage door was open and accessible to the public; (3) the addresses of the tenants occupying the apartments were posted on the garage door; and (4) there were no signs prohibiting entry to anyone who wanted to visit a tenant or conduct business. (*Id.* at p. 793.) *People v. Kilpatrick* (1980) 105 Cal.App.3d 401 (*Kilpatrick*)[2] concluded that "[t]he open carport area was used commonly by all motel tenants and thus was not a private, constitutionally protected space." (*Id.* at p. 409.) In contrast to *Galan* and *Kilpatrick*, here, the laundry room was not open to the public. *People v. Petersen* (1972) 23 Cal.App.3d 883 held that the trial court properly admitted evidence pertaining to dynamite which was found by a police trainee who "entered the garage out of concern for his own safety as a tenant of the apartment complex, and was acting as a private citizen only." (*Id.* at pp. 893-894.) Unlike in

---

[2]     *Kilpatrick*, *supra*, 105 Cal.App.3d 401 was disapproved on other grounds in *People v. Bustamante* (1981) 30 Cal.3d 88, 102, which in turn was superseded by constitutional amendment.

6

*Petersen*, Officer Trinh was not acting in a private capacity and he was not a tenant of the apartment complex.

*People v. Shaw* (2002) 97 Cal.App.4th 833 (*Shaw*) and *People v. Willard* (1965) 238 Cal.App.2d 292 (*Willard*) do not support the People's position. *Shaw* concluded that the defendant's "going out into the common area of an apartment complex and placing drugs in a hole in the ground is simply not the sort of activity reasonably tied to any proper expectation of privacy. . . . [¶] The dispositive factor here is that [the defendant] was not in exclusive control of the area in which he secreted the narcotics." (*Shaw*, at p. 839.) In *Willard*, the officers passed through an open gate and proceeded to the rear door, which was on the side of the duplex and appeared "to have been a normal means of access to and egress from that part of the house." (*Willard*, at p. 307.) As an enclosed structure, the locked room in the present case is readily distinguishable from the backyard in *Shaw* and the side yard in *Willard*.

*People v. Howard* (1976) 63 Cal.App.3d 249 also does not assist the People. In *Howard*, the police officers gained entry through the locked door of an apartment building by entering when someone else used a key. (*Id.* at p. 253.) After the officers went to the defendant's apartment and asked to enter, he gave his consent. (*Ibid.*) *Howard* held that the defendant's constitutional rights were not violated by the officer's entry to the hallway through the locked door. *Howard* reasoned: the apartment manager had previously given a key to the officers and thus they had permission to enter the apartment building; and the locked door served to prevent the public from roaming through the building and a tenant could protect his own privacy by not answering the door. (*Id.* at p. 254.) Unlike *Howard*, here, the officer did not have permission from the apartment manager or anyone else to enter the room. Moreover, as Officer Trinh observed, defendant had been engaging in activities in the room that indicated his

7

expectation of privacy. Thus, the laundry room was not analogous to a hallway in a multi-tenant building which was used by other tenants as well as members of the public.[3]

In sum, we conclude that defendant had a reasonable expectation of privacy in the laundry room.

" '[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' [Citation.]" (*Arizona v. Gant* (2009) 556 U.S. 332, 338.) Here, since the officers did not have a search warrant for the laundry room, the People bore the burden of proving that an exception to the warrant requirement applied. (*People v. Camacho* (2000) 23 Cal.4th 824, 830.) The People have relied on the protective sweep exception. (*Maryland v. Buie* (1990) 494 U.S. 325, 327 (*Buie*).) "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers and others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." (*Ibid.*) A protective sweep is permissible under the Fourth Amendment "if the searching officer 'possesse[d] a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]" the officer in believing,' [citations], that the area swept harbored an individual posing a danger to the officer or others." (*Ibid.*) However, "a protective sweep may not be based on 'a mere "inchoate and unparticularized suspicion or 'hunch . . . .' " ' [Citation.]" (*People v. Celis* (2004) 33 Cal.4th 667, 678.) Generalized concern for officer safety or the uncertainty of the particular circumstance is not enough justification. (See *People v. Werner* (2012) 207 Cal.App.4th 1195, 1209.)

---

[3] *United States v. Nohara* (9th Cir. 1993) 3 F.3d 1239, 1242, *United States v. Conception* (7th Cir. 1991) 942 F.2d 1170, 1171-1172, *United States v. Holland* (2d Cir. 1985) 755 F.2d 253, 255, and *United States v. Eisler* (8th Cir. 1977) 567 F.2d 814, 816 involved common hallways and are distinguishable from the present case for the same reasons.

Applying the *Buie* standard to the present case, we conclude that the protective sweep was not justified. Officer Trinh merely testified that he "did not know if there was anyone else left inside the laundry room." His testimony did not include facts indicating that he had any reason to believe that another person, let alone a dangerous one, remained in the laundry room. He did not testify that he heard any noises or saw any vehicles or people on the premises. Thus, his decision to conduct a protective sweep was not based on a reasonable belief that the laundry room harbored a dangerous person.

The People point out that the suspects in the vandalism and battery incident, who had used a van registered in defendant's name, were still at large and that defendant had an outstanding arrest warrant for battery and brandishing a weapon. Thus, they argue that these facts established a reasonable safety concern and justified Officer Trinh's decision to conduct a protective sweep. We disagree.

Here, Officer Trinh never testified that he believed that the suspects involved in the battery and vandalism were present in the laundry room. He knew that a van registered in defendant's name had been abandoned by these suspects, the offenses had recently occurred "in another part of the city," and defendant was "likely not one of the suspects." Defendant, who was Asian, did not match the description of the suspects in the recent crime. Officer Trinh had no information that defendant knew any of the suspects or that he had loaned his car to any of them. Moreover, there was no information as to when or where those recent crimes had occurred. Thus, it was mere speculation that the suspects might have reached the laundry room before the officers contacted defendant.[4]

---

[4] The People also argue that "the officers needed to inquire as to [defendant's] 'involvement in the alleged vandalism.'" There is no question that the officers properly questioned defendant. However, this fact is irrelevant to a determination of whether the officer was justified in conducting a protective sweep.

9

Officer Trinh also knew that defendant had an outstanding warrant for battery and brandishing a weapon. The People argue that "it would indeed be a 'rational inference' that [defendant] was quite familiar with weapons and how to use them." However, defendant's familiarity with weapons did not support the officer's belief that the laundry room harbored a dangerous individual. (See *United States v. Colbert* (6th Cir. 1996) 76 F.3d 773, 777 [That defendant "'was on escape status at the time, he was wanted for murder, he was under investigation for possible involvement in drug trafficking' . . . are not appropriate facts to consider when determining whether the arresting officers reasonably believed that *someone else inside the house* might pose a danger to them." (Italics in original.)].) Though Officer Trinh knew about defendant's outstanding arrest warrant prior to the protective sweep, this information related to defendant's potential dangerousness, and he was outside the laundry room.[5]

The People's reliance on *People v. Maier* (1991) 226 Cal.App.3d 1670 is misplaced. In *Maier*, the defendant committed robberies and murders with accomplices. (*Id.* at pp. 1672-1673.) The trial court found that the protective sweep reasonable: "'The evidence clearly shows that the police knew that [the defendant] habitually pursued his criminal activities with accomplices in a most dangerous manner. This was his modus operandi. Accordingly, it was both reasonable and proper for the police to search the house for other suspects after the defendant was apprehended and arrested." (*Id.* at p. 1675.) Thus, the Court of Appeal found no constitutional violation. (*Id.* at p. 1677.) Unlike in *Maier*, here, Officer Trinh had no reason to believe that defendant currently associated with criminals or was involved in any criminal enterprise. The officer had no

---

[5] The evidence does not establish that the warrant was a felony arrest warrant rather than a misdemeanor arrest warrant. (See §§ 242, 243, 417.) A misdemeanor arrest warrant ordinarily cannot be executed at night (§ 840), and Officer Trinh did not know whether the warrant authorized nighttime service and he did not have the warrant in his possession. Thus, the seriousness of the crimes upon which the warrant issued is unclear.

reason to believe that any criminal activity, much less criminal activity posing a risk of violence, was occurring in the laundry room before defendant and another man came out.

In sum, Officer Trinh was apprehensive for officer safety because he could not see the entire laundry room through the open door. Since he acted without specific, articulable facts supporting a reasonable suspicion that a person was still inside the laundry room and that person was dangerous, the protective sweep was not justified. Accordingly, the evidence of the pistol and the ammunition in the laundry room was properly excluded.

The People contend that, even if the protective sweep was unlawful, there was an intervening circumstance which broke the causal connection between the illegal conduct and the seizure of the assault weapon in defendant's residence. Defendant argues that the search of the laundry room tainted the search of defendant's home.

"' "[N]ot . . . all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"' [Citations.] '[B]ut-for cause, or "causation in the logical sense alone," [citation] can be too attenuated to justify exclusion . . . .' [Citations.]" (*People v. Brendlin* (2008) 45 Cal.4th 262, 268 (*Brendlin*).) In determining whether an intervening circumstance was sufficient to break the causal connection between the evidence and the unlawful activity, a court considers three factors: "' 'the temporal proximity of the Fourth Amendment violation to the procurement of the challenged evidence, the presence of intervening circumstances, and the flagrancy of the official misconduct.' " (*Id.* at p. 269.)

Here, after Officer Trinh found the ammunition in the laundry room, he and another officer immediately went to defendant's apartment to search for another weapon.

11

Thus, the illegal search of the laundry room was very close in time to the discovery of the assault weapon.

As to the second factor, defendant contends that there were no intervening circumstances. However, the magistrate found that Tran gave her consent to enter the apartment and thus the officers properly seized the assault weapon. "The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects. [Citations.] The prohibition does not apply, however, to situations in which voluntary consent has been obtained . . . ." (*Illinois v. Rodriguez* (1990) 497 U.S. 177, 181.) "To ascertain if the prosecution has met its burden of establishing the consent exception to the warrant requirement, the trial court determines whether an officer's belief that he or she had consent to search is objectively reasonable under the circumstances. [Citation.]" (*People v. Lazalde* (2004) 120 Cal.App.4th 858, 865.) Here, when Officer Trinh asked Tran where defendant kept his guns, she replied that he kept them under the bed. After he also asked her if she could show him, she replied, "Okay," opened the door, allowed the officers into the apartment, led them to her bedroom, pointed to her bed, and said "It's under the bed." Though neither officer expressly requested to search for the guns, Tran's verbal responses and conduct established that she consented to a search. Based on this record, Officer Trinh reasonably believed that Tran had consented to the search.

As to the third factor, "the flagrancy and purposefulness of the police misconduct, is generally regarded as the most important because 'it is directly tied to the purpose of the exclusionary rule—deterring police misconduct.' [Citations.]" (*Brendlin*, *supra*, 45 Cal.4th at p. 271.) We first note that Officer Trinh's unlawful protective sweep of the laundry room was limited in time and scope. Moreover, though there were insufficient facts on which Officer Trinh based his belief on the need for a protective sweep, he subjectively believed that there were additional people who might have posed a danger to the officers. Thus, the officer's conduct was not an egregious violation of the Fourth

Amendment.  More importantly, however, suppression of the evidence of the assault weapon and ammunition would not deter police misconduct, because the officer properly obtained Tran's consent before entering and searching for this evidence.

Considering these factors, we conclude that despite the unlawfulness of the protective sweep, the assault weapon and ammunition were not the fruit of this initial search.  Tran's consent to a search for defendant's guns broke the causal connection between the illegal conduct and the subsequent search in defendant's apartment.  Accordingly, the trial court erred in granting the motion to suppress the evidence found in defendant's apartment.

## IV.  Disposition

The orders are reversed.  The trial court is directed on remand to grant the motion to suppress evidence which was found during the search of the laundry room and to deny the motion to suppress evidence which was found in defendant's apartment.

13

_____
Mihara, J.

WE CONCUR:

_____
Elia, Acting P. J.

_____
Bamattre-Manoukian, J.